IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JEFFREY R. SCOTT,              )
                              )
                    Plaintiff, )
        v.                    )        Case No. 09 C 1633
                              )
LARRY PETERSON                )        Judge Virginia M. Kendall
                              )
                    Defendant. )

## MEMORANDUM OPINION AND ORDER

Plaintiff Jeffrey R. Scott ("Scott") filed a two-count complaint against Defendants John Rita ("Rita") and Larry Peterson ("Peterson") (collectively "Defendants") alleging, pursuant to 42 U.S.C. §§ 1981 and 1983, that Defendants unlawfully terminated his employment because of his race. On March 17, 2010, the Court entered a default judgment against Peterson according to Federal Rule of Civil Procedure 55(a). A prove-up hearing of Scott's damages was held on May 26, 2010. The Court now awards damages of $245,475 for back pay and losses incurred for early IRA withdrawals, both including prejudgment interest, as well as for front pay. The Court also enters and continues Scott's Petition for Plaintiff's Attorneys' Fees, ordering Scott to submit additional evidence on or before August 30, 2010 showing the reasonableness of the specific rates charged for each of its attorneys and paralegals.

## BACKGROUND

The following facts are taken from Scott's Second Amended Complaint and are deemed to be true for purposes of the default judgment against Peterson. *See Dundee Cement Co. v. Howard Pipe & Concrete Prods., Inc.*, 722 F.2d 1319, 1323 (7th Cir. 1983). Scott alleged that he was wrongfully terminated from his employment with the Illinois Youth Center Joliet ("IYCJ") because

of racial discrimination.  (Am. Compl. ¶¶ 14, 18.)  Scott, who is African-American, began work with

the Illinois Department of Corrections in 1993 and was transferred to IYCJ in 1998.  (Am. Compl.

¶ 9.)  Scott worked at the IYCJ until his termination in 2008.  (Am. Compl. ¶ 10.)  During that time,

Peterson was employed as a supervisor at the facility.  (Am. Compl. ¶ 21.)  Over the course of

Scott's employment at IYCJ, he received positive evaluations.  (Am. Compl. ¶ 11.)  However, in

June of 2006, IYCJ initiated an investigation into alleged misconduct by Scott.  (Am. Compl. ¶ 13.)

At the conclusion of the investigation, IYCJ discharged Scott for violating IYCJ rules.  (Am. Compl.

¶ 14.)  Similarly situated non-African-Americans violated the same or similar rules, but were not

discharged for their misconduct.  (Am. Compl. ¶ 14.)

On March 17, 2010, the Court dismissed all claims against Rita pursuant to Federal Rule of

Civil Procedure 12(b)(6).  (*See* R. 65.)  On the same date, the Court entered a default judgment

against Peterson pursuant to Federal Rule of Civil Procedure 55(a) because Peterson had been

properly served with the Second Amended Complaint but had failed to answer or otherwise plead

in response to the claims against him.  (*See id*.)  A prove-up hearing was then held on May 26, 2010

in which Scott testified in support of the damages he has claimed.  Scott requests compensation for

$164,147 in back pay, $112,821 in front pay, $3,011 in penalties incurred for withdrawals from his

IRA, $50,000 for pain and suffering, and $25,000 in punitive damages.  (*See* R. 70, Information and

Materials Supporting Plaintiff Jeffrey Scott's Damages Prove-up ¶¶ 8-16) (hereinafter "Scott

Supporting Materials.")

## DISCUSSION

A default judgment establishes as a matter of law "that defendants [are] liable to plaintiff as

to each cause of action alleged in the complaint."  *Breuer Elec. Mfg. Co. v. Toronado Sys. of Am.,*

*Inc.*, 687 F.2d 182, 186 (7th Cir. 1982). "Upon default, the well-pleaded allegations of a complaint relating to liability are taken as true." *Dundee*, 722 F.2d at 1323. However, while the allegations of the complaint relating to liability must be taken to be true, allegations regarding damages do not. *See id*. at 1323. When a default judgment has been entered, the plaintiff must adequately prove the amount of his damages. *See id*. "Even when a default judgment is warranted based on a party's failure to defend . . . [t]he district court must . . . conduct an inquiry in order to ascertain the amount of damages with reasonable certainty." *In re Catt*, 368 F.3d 789, 793 (7th Cir. 2004) (citing *Credit Lyonnais Secs. (USA), Inc. v. Alcantara*, 183 F.3d 151 (2d Cir. 1999)).

## I.  Back Pay

At the May 26, 2010 prove-up hearing and in his related exhibits, Scott claimed $164,147 in back pay for the period from June 2006, when he was placed on suspension pending discharge, to March 17, 2010, the date on which the Court ruled on Peterson's default. (Scott Supporting Materials ¶ 8.) In both § 1981 and § 1983 cases, back pay is assumed to be appropriate in order to make the plaintiff whole. *See*, *e.g.*, *Williamson v. Handy Button Mach. Co.*, 817 F.2d 1290 (7th Cir. 1987); *see also Barbour v. Merrill*, 48 F.3d 1270 (D.C. Cir. 1995); *Coleman v. Lane*, 949 F. Supp. 604 (N.D. Ill. 1996); *Mister v. Ill. Cent. Gulf R. Co.*, 790 F. Supp. 1411 (S.D. Ill. 1992). Proper calculations of back pay represent the wages the plaintiff would have earned but for the adverse employment decision, less the amount of mitigating wages earned during that time. *See Waters v. Wis. Steel Works of Int'l Harvester Co.*, 502 F.2d 1309, 1321 (7th Cir. 1974) ("[D]amages for the relevant period are to be determined by measuring the difference between plaintiff's actual earnings for the period and those which he would have earned absent the discrimination of defendants."). Prejudgment interest is also presumed to be appropriate in an award of back pay under § 1981 and

§ 1983, even if the employee has not requested it.  *See Williamson*, 817 F.2d at 1298 ("Prejudgment interest therefore must be an ordinary part of any award for back pay . . . under § 1981."); *DeLaCruz v. Pruitt*, 590 F. Supp. 1296 (N.D. Ind. 1984) (prejudgment interest furthers the Congressional purpose underlying § 1983 and is necessary in order to make the wronged party whole).

Scott submitted IRS income transcripts establishing his wages for the years 2003 to 2005, while he was employed by IYCJ, and his wages for the period following his suspension and termination, from 2006 to March 17, 2010.  Based on the average increase in earnings over his three years of documented wages with IYCJ, Scott used a five percent growth rate in his computations. (Scott Supporting Materials ¶ 14.)  With that figure, Scott calculated his projected earnings from 2006 through March 17, 2010 with IYCJ by multiplying the previous year's projected earnings (or actual 2005 earnings in the case of the 2006 projection) by 1.05.  From that projected figure, he subtracted his actual earnings for each year as reflected in the submitted IRS income transcripts to give his annual lost pay as a result of his termination from IYCJ.  (See R. 70-9, Exhibit I, Plaintiff's Back Pay Calculation.) (hereinafter "Plaintiff's Back Pay Calculation").  The majority of these figures have been accurately calculated; however, in determining the back pay from January 1, 2010 through March 17, 2010, Scott mistakenly asserts that the period from January 1 to March 17 covers 3.5 months.  However, January to mid-March represents approximately 2.5 months; the Court has therefore corrected this error in its calculation of Scott's back pay award.[1]  While more data on annual wages with IYCJ for the years before 2003 would be preferable to more substantially

---

[1]  The Court accepts Scott's figures for 2006-2009 as presented in Plaintiff's Back Pay Calculation, but adjusts the 2010 figure for the error regarding the time period between January and March. The "Prorated Projected 2010 Earnings" should equal $15,258—$73,240 projected annual earnings divided by twelve months, times 2.5 months.  Subtracting mitigating wages of $9,859 gives $5,399 in back pay for 2010. This figure, added to Scott's claimed back pay for 2006-2009, gives total back pay of $158,044.

4

establish a realistic growth rate of Scott's wages, Scott has reasonably supported his claim for back pay by submitting the IRS transcripts and accompanying calculations notwithstanding his minor accounting error. The Court therefore awards $158,044 in back pay.

While Scott has not requested prejudgment interest, such an award is appropriate in this case in order for the award to be fully compensatory. *See Williamson*, 817 F.2d at 1297. District courts are directed to "use the prime rate for fixing prejudgment interest where there is no statutory interest rate." *Gorenstein Enters., Inc. v. Quality Care-U.S.A., Inc.*, 874 F.2d 431, 436 (7th Cir. 1989). Compound, rather than simple, interest is also proper. *See id.* Therefore, using the weighed average annual prime rate, compounding annually, Scott is awarded $14,468 in prejudgment interest on his back pay.[2]

## II. Front Pay

Scott also claims front pay for the period of March 18, 2010 to December 31, 2012 in the amount of $112,821. The goal of a front pay award is to put the victim in the financial position he would have enjoyed but for the wrongful employment action, compensating him for the lost earnings from his former job for as long as he could be expected to have held it. *See Barbour*, 48 F.3d at 1279; *see also Johnson v. Chapel Hill Indep. Sch. Dist.*, 853 F.2d 375, 382-83 (5th Cir. 1988) (award of front pay appropriate equitable relief in a case involving Title VII, § 1981, and §1983 violations). In § 1981 and § 1983 employment discrimination cases, in order to sufficiently show that he is entitled to front pay, a plaintiff must present evidence that is not overly speculative and that

---

[2] The annual interest rate used by the Court varied from 8.05% for 2007 to 3.25% for 2009 and 2010 based on a weighted average calculation using historic federal funds rate figures reported by the Federal Reserve. Federal Reserve Bank of New York, *Historical Changes to the Target Federal Funds and Discount Rate: 1971 to Present*, http://www.newyorkfed.org/markets/statistics/dlyrates/fedrate.html. First adding three points to the federal funds rate to give the prime rate, the Court then used the number of days per year that a given interest rate prevailed to calculate a weighted average annual prime rate. That rate was multiplied by the total back pay that had accrued to give the year's lost interest. The annual lost interest was then compounded on the last day of each calendar year, becoming part of the principle of accrued total back pay to which the next year's interest rate was applied.

establishes the award with reasonable certainty. *See Barbour*, 48 F.3d at 1279-80 (citing *McKnight v. General Motors Corp.*, 973 F.2d 1366, 1372 (7th Cir. 1992)); *Sagendorf-Teal v. County of Rensselaer*, 100 F.3d 270, 277 (2d Cir. 1996) (award of front pay appropriate in a § 1983 case when the court can reasonably predict the plaintiff's prospects for future employment). In calculating front pay, Scott uses similar methodology to that in his back pay accounting, employing a predicted five percent growth rate for both his IYCJ wages and his current wages, multiplying his projected earnings from the previous year by 1.05 and then subtracting his estimated mitigating wages from his projected earnings with IYCJ to give his projected annual loss for the remainder of 2010 and for 2011 and 2012. (R. 70-9, Exhibit I, Plaintiff's Front Pay Calculation.) (hereinafter "Plaintiff's Front Pay Calculation"). Scott fails to explain why he requests front pay through 2012, but in order to provide complete relief, front pay may be awarded for a duration through which Scott could have reasonably been expected to remain employed with IYCJ. *See Barbour*, 48 F.3d at 1280 (considerations in determining length of front pay include the previous length of employment and probability of future employment with the defendant employer). Here, Scott's requested front pay would provide Scott with just under three additional years of relief. Given the length of his employment with the Illinois Department of Corrections and IYCJ and his positive evaluations prior to being terminated, the duration of Scott's request appears to be reasonable and is a short enough period that Scott's earning capacity or probability of continued employment during that time is not excessively speculative.

While the period of requested front pay is appropriate, Scott's calculations of front pay include the same mistake regarding the January 1 to March 17 period as his calculations for back pay. (Plaintiff's Front Pay Calculation.) While that mistake was relatively minor in the calculation

of back pay, it has resulted in an error of over $13,000 in Scott's estimated 2010 mitigating wages, upon which he then bases his 2011 and 2012 estimated mitigating wages.[3] The error in number of months between January and March also affected Scott's May 18, 2010 to December 31, 2010 projected IYCJ earnings.[4] This error only affects the projected IYCJ earnings for 2010; the 2011 and 2012 figures properly come from the 2010 annual projected figure of $73,240 to which a five percent growth rate was applied. (*See* Plaintiff's Front Pay Calculation.) Correcting these mistakes and subtracting the new mitigating wage figures from the projected IYCJ earnings, the Court reaches amounts of $20,518 in lost front pay from March 18, 2010 through December 31, 2010, $27,213 in lost front pay for 2011, and $28,573 for 2012.

In addition to his computational error, Scott also failed to discount his expected front pay to its present cash value. Front pay is designed to award the plaintiff the present value of the difference in earnings experienced as a result of termination. *See*, *e.g.*, *Williamson*, 817 F.2d at 1297 (time value of money is taken into account by discounting lost future wages back to present value in explaining why prejudgment interest is not awarded on future earnings); *see also Wulf v. City of Wichita*, 883 F.2d 842, 855-56 (10th Cir. 1989) (upholding an award of future pay discounted to present value). While it is typically the burden of the plaintiff to provide sufficient information for

---

[3] Scott's calculations suggest that the $9,859 he earned from January 1, 2010 through March 17, 2010 represent 3.5 months pay, implying that Scott was earning $2,817 per month, which, when annualized, would give Scott total 2010 wages of $33,804. (Plaintiff's Front Pay Calculation.) However, when the calculations are corrected so that the $9,859 represents only 2.5 months pay, the monthly and annual figures become $3,944 and $47,323, respectively. The corrected 2011 and 2012 wages, based on the $47,232 annual figure for 2010 would therefore be $49,594 for 2011 and $52,073 for 2012. Scott's projected mitigating wages from March 18, 2010 through December 31, 2010, a period of 9.5 months, equals $37,468.

[4] Scott's projected annual 2010 pay with IYCJ was $73,240, or $6,103.33 per month. (*See* Plaintiff's Back Pay Calculation.) Scott deducts his incorrectly calculated projected earnings for January 1 through March 17 from the annual amount to give an incorrect figure for March 18 through December 31, 2010 that represents 8.5 months of pay rather than 9.5 months of pay. (*See* Plaintiff's Front Pay Calculation.) The correct projected earnings with IYCJ from March 18 through December 31 would be the $6,103.33 monthly wage, multiplied by 9.5 months for a total amount of $57,982.

award calculation, including the appropriate discount rate, courts have discretion in resolving uncertainties when awarding damages. *See Barbour*, 48 F.3d at 1280; *see also Standley v. Chilhowee R-IV Sch. Dist.*, 5 F.3d 319, 322 (8th Cir. 1993). Using the corrected figures for annual lost pay calculated by the Court and a discount rate of five percent,[5] the Court awards Scott a total of $69,557 in front pay, representing the present value as of March 18, 2010 of his lost future wages until the end of 2012.

### III. IRA Withdrawal Penalties

Scott has also provided testimony and documentation regarding IRA withdrawal penalties he incurred by having to withdraw funds from his IRA account in order to support himself after his termination. Account statements show that Scott paid $3,011 in taxes as a result of his withdrawals from 2007 to 2009. (*See* R. 70-10, Exhibit J.) Scott testified that these withdrawals were a direct result of his termination and lost wages because he needed to use the money in the account to pay his day-to-day living expenses. That testimony, along with the documentation in Exhibit J, sufficiently establishes that the $3,011 in withdrawal penalties were consequences of Scott's wrongful termination and are damages to which he is entitled. Prejudgment interest is also appropriate for the IRA withdrawal penalties. Using the same method employed in the calculation of prejudgment interest for back pay, Scott is entitled to a total of $395 in prejudgment interest on his IRA withdrawal penalties.

---

[5]  While choosing a discount rate for calculation of present value is by nature speculative, the Court has chosen five percent based on its above calculations of average prime rates from 2006 to 2010, where five percent represents an approximate average over the previous four-year period, and is a realistic, reasonably attainable rate of growth for the next two years.

## IV. Damages for Pain and Suffering

Scott has also asked for compensatory damages for the pain and suffering he experienced as a result of his wrongful termination. At the prove-up hearing, Scott stated that he experienced humiliation and embarrassment, loss of personal relationships, and sleeplessness, among other emotional harms as a result of his termination from IYCJ. However, Scott provided no additional testimony in support of those claims. He had no medical bills, psychologist visits, or testimony of family or friends to corroborate his statements. Due to the lack of corroborating evidence, Scott has failed to prove his damages for emotional distress and pain and suffering with the reasonable certainty required.

Scott correctly notes that emotional damages may be established by the testimony of the plaintiff alone, and do not necessarily require support from medical records, experts, or other testimony. *See Tullis v. Townley Eng'g & Mfg. Co., Inc.*, 243 F.3d 1058 (7th Cir. 2001); *Busche v. Burkee*, 649 F.2d 509, 519 n.12 (7th Cir. 1983) (absence of a medical expert is not fatal to claims for emotional injuries). However, credibility of evidence relating to damages is a factual determination to be made by the court, and a "plaintiff must prove the existence and magnitude of subjective injuries with competent evidence." *Busche*, 649 F.2d at 519 (internal quotation marks omitted); *see also Alston v. King*, 231 F.3d 383 (7th Cir. 2000) (while a plaintiff's testimony in itself may be enough to establish emotional distress, he must still reasonably and sufficiently explain the circumstances of the injury rather than rely on mere conclusory statements).

Unsupported statements alleging humiliation and depression are insufficient to establish damages for emotional distress or pain and suffering. *See, e.g.*, *Denius v. Dunlap*, 330 F.3d 919 (7th Cir. 2003) ("bare allegations by a plaintiff that the defendant's conduct made him 'depressed,'

'humiliated,' or the like are not sufficient to establish injury [for pain and suffering in an § 1983 action] unless the facts underlying the case are so inherently degrading . . . to infer that a person would suffer emotional distress. . . ."); *Nekolny v. Painter*, 653 F.2d 1164, 1172-73 (7th Cir. 1981) (finding insufficient evidence to support the jury award for damages for emotional distress when plaintiff only asserted that he was depressed, despondent and humiliated).  So while a plaintiff's testimony alone *could* support an award of damages for pain and suffering, here it does not.  Scott's vague statements about his humiliation, loss of relationships, and sleeplessness, without more, do not entitle him to any additional compensatory damages.  The Court therefore denies Scott's request for damages for pain and suffering.

## V.  Punitive Damages

Scott has also requested that $25,000 in punitive damages be entered against Peterson. Punitive damages are appropriate when there has been a reckless disregard of an individual's rights or intentional violations of federal law.  *See Merriweather v. Family Dollar Stores of Ind., Inc.*, 103 F.3d 576 (7th Cir. 1996).  In discrimination cases, an award of punitive damages requires a showing that the defendant acted "with malice or with reckless indifference to the federally protected right of the aggrieved individual." 42 U.S.C. § 1981(b)(1).  In order to establish support for punitive damages, Scott must show more than simply that unlawful discrimination was the reason for the wrongful termination.  *See Williamson*, 817 F.2d at 1296.  Here, Scott has failed to show any specific actions by Peterson regarding Scott's termination, much less any evidence that shows that Peterson acted with malice or reckless indifference to Scott's rights.  Because Scott has not proven that Peterson acted with malice or reckless indifference, he has failed to sufficiently support an award of punitive damages.

In sum, therefore, Scott is not entitled to any award of punitive damages or damages for his alleged pain and suffering, but the Court awards a total of $245,475 for back pay, prejudgment interest on back pay, the present value of lost front pay, losses incurred from early IRA withdrawal, and prejudgment interest on the IRA withdrawal penalties to be paid by Peterson.

## VI. Attorneys' Fees

In addition to Scott's requests for the aforementioned damages, he has also filed a petition to recover attorneys' fees under 42 U.S.C. § 1988. Scott's attorneys have requested fees in the amount of $72,937.50 for the work of three attorneys—Craig Annunziata ("Annunziata"), who was appointed to represent Scott on March 31, 2009, Brian Jackson ("Jackson"), who filed his appearance on April 7, 2009, and John Berg ("Berg"), who filed his appearance on May 19, 2010. (*See* R.72, pp. 1-3.) Scott also requests fees for the work of paralegals Cynthia Muehling ("Muehling"); Dana Blumthal ("Blumthal"), and Heather Macdonald ("Macdonald"). (*See* R.72, pp. 1-3.) This fee total represents 23.4 hours of work by attorney Annunziata at a rate of $435 per hour; 14.1 hours of work by attorney Berg at a rate of $345 per hour; 177.6 hours by attorney Jackson at a rate of $315 per hour; and 3.7 hours, 5.5 hours, and 0.8 hours for Muehling, Blumthal, and MacDonald respectively, each at a rate of $195 per hour. (*See* R.72, Exhibit B.) Scott's attorneys have submitted a record of their hours worked, as well as affidavits of Annunziata, Berg, and Jackson certifying their job titles, billing rates, and statuses with the Illinois bar. (R.72, Exhibits C, D, E, and F.)

"In any action or proceeding to enforce a provision of [42 U.S.C. §§ 1981, 1983] the court, in its discretion may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs . . . ." 42 U.S.C. § 1988. While the court has discretion in awarding

attorneys' fees, "fees should only be denied when special circumstances would render an award unjust." *Lenard v. Argento*, 699 F.2d 874, 899 (7th Cir. 1983) (citing *Dawson v. Pastrick*, 600 F.2d 70, 79 (7th Cir. 1979)). "Parties are 'prevailing' for § 1988 purposes 'if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit.'" *Coleman v. Frierson*, 607 F. Supp. 1578, 1580 (N.D. Ill. 1985) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983)). An award of attorneys' fees is appropriate in the event of default by the defendant as long as the plaintiff qualifies as a prevailing party. *See id.* (awarding attorneys' fees to plaintiff's counsel after the court entered a default judgment against defendant and then conducted a jury trial on the issue of damages); *see also Williams v. Z.D. Masonry Corp.*, No. 07 C 6207, 2009 WL 383614 (N.D. Ill. Feb. 17, 2009) (Soat Brown, M.J.) (awarding adjusted attorneys' fees under § 1988 when plaintiff had earned a default judgment against defendant for Title VII and § 1981 claims). Attorneys' fees are also appropriately awarded even if plaintiff's counsel was originally appointed. *See Witherspoon v. Sielaff*, 507 F. Supp. 667 (N.D. Ill. 1981). Here, because Scott prevailed in his awards of back and front pay as well as IRA withdrawal penalties as outlined above, he is entitled to reasonable attorneys' fees for his work in obtaining that result. *See, e.g.*, *Turner v. Carothers*, No. 83-1166, 1986 WL 1433, at *1 (N.D. Ill. January 15, 1986) (Kocoras, J.) ("The plaintiffs . . . brought and won on default, a civil rights action under 42 U.S.C. section 1983 against defendant . . . As the prevailing parties in the action, the plaintiffs may recover 'a reasonable attorney's fee as part of the costs.'").

A reasonable fee should represent "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Coleman*, 607 F. Supp. at 1580 (citing *Hensley*, 461 U.S. at 433). In determining the appropriateness of this lodestar amount, the court may consider many

factors, including the "novelty and difficulty of the questions involved, the amount involved and the results obtained, the customary fee and the experience and ability of the attorney." *Id.* The party requesting the fee has the burden of proving its reasonableness, including the hourly rate and appropriate hours expended. *See Hensley*, 461 U.S. at 437.

### A. Hourly Billing Rate

A reasonable hourly billing rate reflects the prevailing market rate for similar types and qualities of legal work. *See Gautreaux v. Chi. Housing Auth.*, 491 F.3d 649, 660 (7th Cir. 2007). "In determining the market rate, an attorney's actual billing rate for comparable work is presumptively appropriate to use as the market rate." *Mathur v. Bd. of Trustees of S. Ill. U.*, 317 F.3d 738, 743 (7th Cir. 2003) (citing *Spegon v. Catholic Bishop of Chi.*, 175 F.3d 544, 555 (7th Cir. 1999)). "An attorney's self-serving affidavit alone cannot establish the market rate for that attorney's services," however, but must be presented "in conjunction with other evidence of the rates charged by comparable lawyers" in order "to satisfy plaintiffs' burden." *Harper v. City of Chicago Heights*, 223 F.3d 593, 604 (7th Cir. 2000) (citing *Spegon*, 175 F.3d at 555).

Here, Annunziata, Jackson, and Berg have each asserted in self-serving affidavits that the rates submitted in the request for fees are the rates that they charge; each also states that he exclusively practices employment and labor law, and certifies his time as a member of the Illinois bar. (*See* R. 72, Exhibits D-F.) By failing to provide any evidence of the rates charged by comparable lawyers in the area, Scott has not met the burden of showing reasonableness. *See, e.g.*, *Harper*, 223 F.3d at 604 (district court did not abuse its discretion in accepted proposed hourly rates where the attorneys supported their rates with their own affidavits confirming their reasonableness and affidavits from other attorneys practicing in that market); *Markon v. Bd. of Educ. of the City of*

*Chicago*, 525 F. Supp. 2d 980, 982 (N.D. Ill. 2007) (finding plaintiff's burden of showing reasonableness satisfied when plaintiff submitted not only counsel's affidavit and billing records but also affidavits by two other lawyers "attesting that Sweeney's reduced hourly rate of $285 per hour was reasonable"). Scott also does not present any material supporting the paralegals' hourly rate of $195, and recent cases have found reasonable paralegal billing rates ranging from $85 an hour to $175 an hour at the high end. *See Dupuy v. McEwen*, 648 F.Supp. 2d 1007, 1017 (N.D. Ill. 2009); *see also Riddle v. Nat'l Sec. Agency, Inc.*, No. 05 C 5880, 2010 WL 1655443 (N.D. Ill. Apr. 23, 2010) (Soat Brown, M.J.) ($150 hourly rate for paralegals reasonable); *Sierra Club v. Franklin County Power of Illinois, LLC*, 05 C 4095, 2009 WL 3816816 at *8 (S.D. Ill. Nov. 12, 2009) (Gilbert, J.) ($125 an hour paralegal fees reasonable); *Tillman v. New Line Cinema Corp.*, No. 05 C 910, 2008 WL5427744, *9 (N.D. Ill. Dec. 31, 2008) (Kennelly, J.) (paralegal rates up to $175 per hour are appropriate). The Court, therefore, orders Scott to submit additional evidence on or before August 30, 2010 of the reasonableness of the billing rates of its attorneys and paralegals. The Court next addresses the hours expended by the attorneys and paralegals, and will apply the billing rates to these hours when properly supported.

**B. Unrelated Work**

In evaluating the proposed number of billed hours in a request for attorneys' fees, courts consider the itemized time and accompanying descriptions of work relating to the case, checking for unrelated work on unsuccessful claims. *See, e.g.*, *Lenard v. Argento*, 808 F.2d 1242, 1245 (7th Cir. 1987); *Coleman*, 607 F.Supp. at 1580. Time spent pursuing claims that are not reasonably related to the plaintiff's successful claims should not be considered in an award of attorneys' fees. *Lenard*, 808 F.2d at 1245-46 (citing *Hensley*, 461 U.S. at 435). In order for a claim to be sufficiently related

to a successful claim to allow it to be considered, the time spent must be "deemed to have been expended in pursuit of the ultimate result achieved." *See Hensley*, 461 U.S. at 435 (internal citation omitted).

Here, Scott's attorneys spent a significant amount of time researching and litigating claims against additional defendants, filing a Second Amended Complaint after the Court dismissed the first with respect to Rita for failure to state a claim and with respect to IDJJ on sovereign immunity grounds, and filing case-scheduling related motions. (*See* R. 40, R. 72, Exhibit C.) None of this work was performed in support of Scott's claims against Peterson, because Peterson never responded to any complaint filed by Scott. *See* R. 32, p. 2 (explaining, in the reply in support of Defendants' Rita's and IDJJ's motion to dismiss, that "Defendants' counsel has not yet filed an appearance on behalf of Peterson"); *see also* R. 40, p. 1 (explaining that only IDJJ and Rita moved to dismiss). Thus, the majority of the work included in Scott's fee petition was not related to the ultimate successful result of the claims against Peterson on default judgment. *See Lenard*, 808 F.2d at 1245. Indeed, this work resulted in a dismissal with prejudice of Scott's claims against both IDJJ and Rita.

The only work by Scott's attorneys that can be said to be related to the ultimate successful result of the case, then, was the time spent drafting the First Amended Complaint after being appointed, serving Peterson, and then preparing for and conducting the prove-up hearing. *See Hensley*, 461 U.S. at 435 (courts should look to whether the work can be "deemed to have been expended in pursuit of the ultimate result achieved"). The Court describes each attorney's time billed in one of these regards in turn.

### 1. Attorney Annunziata

Annunziata's only hours billed for one of these purposes occurred on 5/19/10, when he billed 4.1 hours preparing damage prove-up materials for filing and reviewing the materials in preparation for the hearing. (*See* R. 72, Exhibit C.)

### 2. Attorney Berg

Turning to Berg, his hours billed related to the prove-up hearing were: 4.1 hours on 5/19/10 preparing damage prove-up materials for filing and reviewing the file in preparation for hearing; .2 hours on 5/20/10 preparing direct examination outline for prove-up hearing; .8 hours on 5/24/10 preparing an outline for punitive damage and emotional distress sections of the direct examination of Scott; 2.1 hours on 5/25/10 reviewing and revising direct examination outline for Scott at the prove-up hearing; 3.8 hours on 5/25/10 in an office conference with Scott and Jackson preparing for prove-up hearing; 1.2 hours on 5/26/10 preparing an outline for Scott's direct examination; .4 hours on 5/26/10 preparing Scott for prove-up testimony; and 1.3 hours on 5/26/10 conducting the prove-up hearing in Court. (*See* R. 72, Exhibit C.) Berg's total number of appropriately billed hours was thus 13.9.

### 3. Attorney Jackson

With respect to Jackson, his hours billed in filing the First Amended Complaint are as follows: 1.2 hours on 6/26/09 performing legal research for the Amended Complaint; 1.2 hours on 6/29/09 drafting the Amended Complaint and reviewing cases regarding Amended Complaint claim; 4.2 hours on 6/30/09 researching Section 1981, Section 1983, and equal rights claims, and drafting the Amended Complaint; 4.2 hours on 7/1/09 drafting the Amended Complaint; 1.6 hours on 7/2/09 calling and emailing Scott regarding the Amended Complaint and editing the Amended Complaint;

and 2.8 hours on 7/6/09 calling the Illinois Attorney General's office regarding the Amended Complaint, editing it and emailing Scott regarding it. (*See* R. 72, Exhibit C.) His total number of hours spent on the Amended Complaint was 15.2.

Jackson then billed 10.8 hours related to effectuating service of Peterson. Those hours were as follows: .8 hours on 9/2/09 drafting an email to Scott about Peterson's whereabouts; .3 hours on 9/9/09 emailing with opposing counsel about Peterson's whereabouts; .3 hours on 9/11/09 calling Scott regarding Peterson's whereabouts; 1.3 hours on 9/14/09 calling opposing counsel again about Peterson and reviewing the federal rules on issuing a summons; 1.1 hours on 9/16/09 editing a rider to the subpoena for Peterson's address, calling opposing counsel regarding it, and reviewing online information about Peterson's last known address; 1.6 hours on 9/17/09 calling Scott regarding Peterson's whereabouts and calling opposing counsel regarding service of Peterson; .8 hours on 9/21/09 calling Scott regarding Peterson; .3 hours on 9/23/09 emailing a J. VanHaughten regarding service of Peterson; 1.2 hours on 9/29/09 reviewing the documents produced in response to the subpoena for Peterson's address and emailing opposing counsel about it; 1.3 hours on 10/6/09 discussing the private investigator's service of the summons with paralegal Blumthal and reviewing federal and local rules about Peterson's attempt to evade the Court's jurisdiction; and 1.8 hours on 10/7/09 calling Jack King regarding service of Peterson, drawing an affidavit of Jack King, and reviewing the rules regarding service of summons. (*See* R. 72, Exhibit C.)

Finally, Peterson billed 32.4 hours in connection with the prove-up hearing. Specifically, he billed .8 hours on 3/31/10 reviewing the Court's order regarding "prove up" documents and calling and emailing opposing counsel regarding the state's potential representation of Peterson; 1.2 hours on 4/2/10 reviewing documents related to damages and drafting a letter identifying outstanding

documents; 2.6 hours on 4/1/10 researching sufficient prove-up evidence and framework for a prove-up; 1.2 hours on 5/3/10 reviewing Scott's documents regarding damages and reviewing case law regarding documents to support prove-up damages; .7 hours on 5/7/10 preparing a prove-up pleading; 3.8 hours on 5/10/10 performing research on damages allowable under Sections 1981 and 1983 and drafting prove-up; 1.1 hours drafting prove-up documents on 5/11/10; 1.6 hours on 5/13/10 researching availability of retirement benefits as damages; 2.8 hours on 5/17/10 researching Section 1981 and Section 1983 claim in relation to damages for pain and suffering and emotional distress and drafting prove-up documents; 2.8 hours on 5/18/10 researching Illinois employee indemnification law and drafting prove-up documents; 5.2 hours on 5/19/10 drafting damage calculations and prove-up documents; 1.2 hours on 5/20/10 drafting direct examination for Scott; 1.4 hours on 5/24/10 continuing to draft the direct examination; 3.2 hours on 5/25/10 preparing Scott to testify and drafting his direct examination; and 2.8 hours on 5/26/10 preparing Scott and conducting the prove-up hearing. (*See* R. 72, Exhibit C.) Jackson thus expended a total of 58.4 hours on the Amended Complaint, effectuating service, and the successful portions of the prove-up.

### 4. Paralegals

The paralegals' relevant billings included .4 hours by Muehling on 10/30/09 electronically filing service returned executed as to Peterson and confirming whether a notice of filing was required and .2 hours by Macdonald on 5/20/10 hand delivering courtesy copies of the damages prove-up to the Court. (*See* R. 72, Exhibit C.) Paralegal Blumthal also billed: .6 hours on 7/6/09 filing the First Amended Complaint with this Court; .7 hours on 9/16/09 and 1.1 hours on 9/17/09 researching Peterson's current contact information; .2 hours on 9/24/09 calling process server Jack King regarding serving Peterson; .6 hours on 9/25/09 drafting a summons for Peterson; .7 hours on

9/25/09 drafting a letter to the process server with a summons and delivering it to his office; .7 hours on 10/2/09 drafting a new summons for Peterson; and .4 hours on 10/6/09 calling Jack King regarding serving of an alias summons. (*See* R. 72, Exhibit C.) That brings the paralegals' billing total to 5.6 hours.

### C. Degree of Success and Other Factors

In addition to considering time not related to the ultimate successful outcome in a case, other factors relevant to the Court's determination include the novelty or complexity of the questions involved and the experience, reputation, and ability of the attorneys. *See Lynch v. City of Milwaukee*, 747 F.2d 423, 426 (7th Cir. 1984) (citing *Hensley*, 461 U.S. at 430). Here, Scott's case was a relatively simple employment civil rights case with straightforward facts and clear legal theories. The case did not go to trial, but was decided by default, involving only one, short prove-up hearing at which only Scott testified. Moreover, the affidavits of each attorney establish their exclusive experience in labor and employment matters and the lengths of time for which they have been licensed, showing substantial experience and indicating ability in this area of the law that should have lessened the time required to litigate this case. (*See* R. 72, Exhibits D, E, F.)

The Court also considers the overall reasonableness of the requested fee, analyzing the "relationship between the extent of success and the amount of the fee award." *See Farrar*, 506 U.S. at 115-16 (citing *Hensley*, 461 U.S. at 438). If "a plaintiff has achieved only partial or limited success, [the reasonable lodestar amount] may be an excessive amount. This will be true even where a plaintiff's claims were interrelated . . . ." *Hensley*, 461 U.S. at 436. The Court may then reduce the overall award amount to reflect the Plaintiffs' degree of success. *See id.* Here, Scott's overall success on his claims was limited, with all of his claims being dismissed with prejudice except with

respect to Peterson who defaulted. Indeed, the default in this case was not even granted upon Scott's motion–the Court entered default sua sponte based on Peterson's failure to answer.

For each of these reasons, the Court in its discretion finds the total number of hours–76.4 hours of attorney time and 5.6 of paralegal time--billed on filing a standard Amended Complaint, serving Peterson, and conducting a straightforward prove-up excessive, and reduces the lodestar by fifty percent. *See Libby by Libby v. Ill. High School Ass'n*, 921 F.2d 96, 98 (7th Cir. 1990) ("An attorneys' fees award pursuant to § 1988 rests within the sound discretion of the district court because that court is particularly well-qualified to make the partially subjective findings necessary for an award of fees and to perform the balancing of equities that is an integral part of the proceeding for an award of fees."); *see also Hensley*, 461 U.S. at 435 ("[T]he district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation."). Thus, when Scott introduces proper support for the billing rates, the Court will divide the total amount of the fee award for each attorney and paralegal by half.

**D. Prejudgment Interest**

Prejudgment interest may also be considered in an award for attorneys' fees, and may be included at the discretion of the court if necessary in order to make the award fully compensatory. *Shott v. Rush-Presbyterian St. Luke's Medical Ctr.*, 338 F.3d 736 (7th Cir. 2003). In most federal cases, including those under § 1988, prejudgment interest is presumptively appropriate. *See id.* at 744-45. However, prejudgment interest or other award adjustments are ultimately at the court's discretion, and when considered under § 1988, are often awarded in order to compensate the attorneys for an unreasonable or unexpected delay in payment. *See Missouri v. Jenkins by Agyei*, 491 U.S. 274, 284 (1989); *see, e.g., Owner-Operator Indep. Drivers' Assoc. Inc. v. Mayflower*

*Transit, Inc.*, 659 F. Supp. 2d 1016 (S.D. Ind. 2009). Unlike in *Missouri* or *Shott*, where adjustments for § 1988 awards to account for time that had passed without payment were found to be appropriate, in this case, there has been no delay after the entry of default to interfere with the payment of counsel. Scott's counsel was originally appointed, and without the award of attorneys' fees, there likely would be no payment to the attorneys, much less prompt, periodic payment during the year that the attorneys worked on Scott's case. If payment was not delayed or even expected, there is no need for an award of compensating interest. Therefore, the award of attorneys' fees is sufficient to fully compensate Scott's attorneys, who were not expecting payment throughout the duration of their work on the case, and prejudgment interest on the award of attorneys' fees is unnecessary.

## CONCLUSION

The Court grants Scott a total of $245,475 for back pay, lost IRA withdrawal penalties, prejudgment interest, and front pay discounted to present value at March 18, 2010, but does not award any damages for emotional distress, pain and suffering, or other punitive damages. The Court also enters and continues Scott's Petition for Plaintiff's Attorneys' Fees, ordering Scott to submit additional evidence on or before August 30, 2010 showing the reasonableness of the specific rates charged for each of its attorneys and paralegals. Once such evidence is submitted, the Court will apply the reasonable billing rates to the fee petition as outlined above.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: August 11, 2010